**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

MELISSA NICOLE CRAMER,
as Administratrix on behalf of the
ESTATE OF JAYDEN MICHAEL ARTHURS,

Plaintiff,

v. CIVIL ACTION NO. 3:26-0343

THE CITY OF HUNTINGTON;
JONATHAN DRAKE,
individually and in his official capacity; and
AARON LAWHON,
individually and in his official capacity,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 9. Plaintiff has responded that she does not oppose the dismissal of some claims, but objects to the dismissal of other claims. For the following reasons, the Court **GRANTS, in part**, and **DENIES, in part**, Defendants' motion.

**I.**
**FACTUAL ALLEGATIONS**

Plaintiff Melissa Nicole Cramer, as Administratrix on behalf of the Estate of Jayden Michael Arthurs, filed a Complaint in this Court on May 15, 2026. In the Complaint, Plaintiff asserts that on March 15, 2025, around 8:53 p.m. her son, Jayden Arthurs, was driving lawfully on 5th Avenue in Huntington, West Virginia. *Compl.* ¶¶1, 10. At the same time, Huntington Police Officer Jonathan Drake was driving a police cruiser nearby and activated his cruiser's emergency

lights to stop Mr. Arthurs for what Plaintiff suspects was a misdemeanor traffic violation. *Id*. ¶¶10, 12. Mr. Arthurs did not stop his vehicle, and Officer Drake initiated a pursuit. *Id*. ¶13.

A few minutes after the pursuit began, Mr. Arthurs' vehicle became stuck on a residential dead-end driveway. *Id*. ¶21. At that point, several police cruisers parked behind the driveway, and Officer Drake and Huntington Police Officer Aaron Lawhon positioned themselves to the side of the projected path of Mr. Arthurs' vehicle. *Id*. ¶¶21, 22. Officer Lawhon told Mr. Arthurs to exit the vehicle, but Mr. Arthurs instead slowly reversed it away from hitting anyone. *Id*. ¶¶23, 24. Plaintiff alleges that Officer Drake then fired twelve rounds into the vehicle, and Officer Lawhon fired an additional four rounds into the vehicle. *Id*. ¶¶25, 26. Mr. Arthurs was struck multiple times and died at the scene at 9:03 p.m. *Id*. ¶28. Plaintiff asserts Mr. Arthurs "did not present an imminent threat of serious bodily harm" to anyone and, "[u]pon information and belief, no illegal substances, firearms, or other weapon [were] recovered from Mr. Arthurs' person or from the vehicle he was operating." *Id*. ¶¶30, 41.

According to Plaintiff, Officer Lawhon was trained "in de-escalation, high-risk vehicle stops, and vehicle gunfighting techniques." *Id*. ¶31. As the ranking officer, he also "had supervisory authority under the Policy to assume control of and terminate the pursuit at any time." *Id*. ¶1. However, he failed to do so and did not stop the use of deadly force. *Id*. On the other hand, Plaintiff asserts that Office Drake has no "documented training on vehicle pursuit procedures, de-escalation, or the constitutional limits on the use of deadly force during vehicle encounters at any point during his approximately four years of service with the Huntington Police Department prior to the subject incident." *Id*. ¶67(i). Plaintiff claims that Officer Drake's initiation of the pursuit and failure to terminate it was reckless and in violation of the Huntington Police Department's Vehicle Pursuit Policy. *Id.* ¶20.

In Count I of the Complaint, Plaintiff alleges a claim pursuant to 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment against Officer Drake. In Count II, he asserts the same cause of action against Officer Lawhon. In Count III, Plaintiff alleges a § 1983 claim against Officer Drake for unlawful seizure in violation of the Fourth Amendment. In Count IV, Plaintiff alleges a municipal liability claim against the City of Huntington. Finally, in Count V she asserts a claim of gross and reckless misconduct. Included in her Prayer for Relief, Plaintiff also seeks punitive damages.

## II.
## STANDARD OF REVIEW

Defendants filed their motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, they acknowledge their motion was filed after their Answer, so the Court may elect to treat it as a motion for judgment on the pleadings under Rule 12(c). The Court agrees that the motion falls under Rule 12(c), but "as a practical matter, the standard of review for a Rule 12(c) motion is nearly identical to one under Rule 12(b)(6), with the key difference being that under Rule 12(c) a court also may consider a party's Answer and attachments." *Slone v. Racer*, Civ. Act. No. 3:23-0636, 2024 WL 4314898, at *2 (S.D. W. Va. Sept. 26, 2024) (citations omitted). Thus, under Rule 12(c), the Court "accept[s] the complaint's factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff[]." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018) (citation omitted). As with Rule 12(b)(6), however, "the court need not accept the legal conclusions drawn from the facts, and need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385–86 (4th Cir. 2009) (internal citations, brackets, and quotations omitted). Additionally, the Court should grant the "motion only if, accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in

the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Slone*, 2024 WL 4314898, at *2 (internal quotation marks and citations omitted).

## III.
## DISCUSSION

In their motion, Defendants argue that Plaintiff's claims against Officers Drake and Lawhon in their official capacity are claims against the City of Huntington and should be dismissed, Count V must be dismissed against the City because the West Virginia Governmental Tort Claims and Insurance Reform Act does not impose liability on a political subdivision for wanton and reckless conduct,[1] and Plaintiff's demand for punitive damages against the City must be dismissed as they are not permitted under either § 1983 or West Virginia law. In her Response, Plaintiff states she does not oppose the dismissal of any of these claims. Therefore, the Court **GRANTS** Defendants' motion in these respects and **DISMISSES** the official-capacity claims against Officers Drake and Lawhon, Count V against the City of Huntington, and Plaintiff's claim for punitive damages against the City of Huntington.

Defendants also argue that Counts III and IV must be dismissed. Plaintiff opposes dismissal of these Counts. Therefore, the Court will address the parties' arguments.

### A.
### Unlawful Seizure in Violation of the
### Fourth Amendment against Officer Drake

In Count III, Plaintiff alleges that "[t]he activation of emergency lights constituted a show of authority and a seizure within the meaning of the Fourth Amendment." *Id*. ¶58. At the time, Plaintiff states "Defendant Drake lacked reasonable articulable suspicion to believe that Mr.

[1]Plaintiff asserts Count V only is directed at Officers Drake and Lawhon.

Arthurs was engaged in, had engaged in, or was about to engage in criminal activity at the time he initiated the seizure," and the seizure was "objectively unreasonable in violation of the Fourth Amendment." *Id.* ¶¶62, 63. As a result, Plaintiff claims "[t]he unlawful seizure set in motion a continuous chain of events that directly and proximately caused Mr. Arthurs' death, including the high-speed pursuit, the dead-end confrontation, and the use of deadly force." *Id*. ¶64.

Defendants argue this claim should be dismissed because Mr. Arthurs was not seized withing the meaning of the Fourth Amendment when Officer Drake activated his emergency lights because Mr. Arthurs did not stop. In support, Defendants cite the Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621 (1991), which held a person is not "seized" when a police officer tells someone to stop, but the individual flees. 499 U.S. at 626. Rather, "[a]n arrest ['seizure'] requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id*. (italics original). In making its decision, the Supreme Court found relevant its earlier decision in *Brower v. Inyo County*, 489 U.S. 593, 596 (1989), in which it explained that "police cars with flashing lights had chased the decedent for 20 miles—surely an adequate 'show of authority'—but he did not stop until his fatal crash into a police-erected blockade[;]" therefore, the Court "did not even consider the possibility that a seizure could have occurred during the course of the chase because, as we explained, that 'show of authority' did not produce his stop." *Id*. Additionally, the Supreme Court stated in *Tennessee v. Garner*, 471 U.S. 1 (1985), that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person," and "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. at 7.

Under this line of cases, Defendants insist Mr. Arthurs was not seized when Officer Drake activated his emergency lights because Mr. Arthurs did not stop. Plaintiff agrees that a seizure

under the Fourth Amendment "occurs 'when there is a governmental termination of freedom of movement through means intentionally applied.'" *Pl.'s Resp. in Opp. to Defs.' Partial Mot. to Dismiss*, at 4, ECF No. 14 (quoting *Brower*, 489 U.S. at 597; italics omitted in Pl.'s Resp.). Plaintiff also concedes that "Count III can be read as pleading only a pre-shooting seizure by show of authority[.]" *Id.* Nevertheless, Plaintiff argues Count III states a plausible basis for an unlawful seizure because paragraph 56 of Count III incorporates the prior allegations in the Complaint, which includes the fact Mr. Arthurs was shot. *Id*. at 4, 5.

Although the Court agrees that the case law supports a seizure at the time Mr. Arthurs was shot, Plaintiff asks this Court to read into Count III a claim that simply is not there. In Count III, Plaintiff very clearly alleges *"[t]he activation of emergency lights constituted* a show of authority and *a seizure* within the meaning of the Fourth Amendment." *Compl.* ¶58 (italics added). It further alleges that the "unlawful seizure" set forth a "chain of events that directly and proximately caused Mr. Arthurs' death, including the high-speed pursuit, the dead-end confrontation, and the use of deadly force." *Id*. ¶64. Clearly, these allegations, taken in the light most favorable to Plaintiff, only can be read to assert the seizure occurred when the emergency lights were activated—which *preceded* Mr. Arthurs' death. There is nothing in Count III alleging the seizure occurred when Mr. Arthurs was shot, and merely adding boilerplate language incorporating language from Counts I and II that the shooting was unlawful under the Fourth Amendment does not change the very specific allegations in Count III stating the seizure occurred when the lights were activated. Therefore, under the above case law, the Court **GRANTS** Defendants' motion to dismiss Count III as Mr. Arthurs was not seized when the lights were activated because he never submitted to that show of authority.

**B.**
**Municipal Liability (Monell Claim)**
**against the City of Huntington**

Defendants next argue that Count IV must be dismissed because Plaintiff has not adequately stated a claim against the City. In the seminal case of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court held that a municipality cannot be liable under § 1983 "*solely* because it employs a tortfeasor." 436 U.S. at 691 (italics original). Stated differently, municipalities "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted). Rather, liability may attach "when execution of a government's policy or custom . . . inflicts the injury[.]" *Monell*, 436 U.S. at 694. Liability occurs when "the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (italics original) ("*Respondeat superior* or vicarious liability will not attach under § 1983.").

Additionally, "[t]o hold a municipality liable for a constitutional violation pursuant to *Monell*, a plaintiff must establish 'the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights.'" *Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 821–22 (4th Cir. 2026) (quoting *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (citing *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)). There are four ways in which an official policy or custom may be indicated:

> (1) [T]hrough an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Id.* at 822 (internal quotation marks and citations omitted).

Here, Plaintiff claims several "policies, customs and/or practices of the City of Huntington" resulted in the constitutional violations alleged in the Complaint. *Compl.* ¶67. These include:

a. Failure to adequately train officers regarding the constitutional requirements for initiating investigatory stops and pursuits, including the requirement of reasonable articulable suspicion;

b. Failure to adequately train officers regarding the constitutional limits on the use of deadly force in vehicle encounters, including situations where officers are not in the direct path of a vehicle;

c. Failure to train officers on crossfire awareness and backdrop safety when discharging firearms in residential settings;

d. Failure to adequately train officers on the affirmative duty to intervene when a fellow officer uses excessive force;

e. Failure to properly supervise officers in high-speed pursuit and vehicle containment situations;

f. Tolerance or ratification of unconstitutional uses of force, including a pattern or practice of failing to discipline officers who use excessive force;

g. Failure to train officers on the City's own Vehicle Pursuit Policy (General Order 2.520), including its prohibition on shooting at or from moving vehicles, its requirement that deadly force during pursuits be used only as a "last resort" with pursuit supervisor authorization, and its mandatory pursuit termination criteria;

h. Failure to maintain and update the Vehicle Pursuit Policy, which was last revised on February 16, 2015—more than ten years before the subject incident—despite evolving constitutional standards and best practices governing the use of deadly force in vehicle encounters;

i. Failure to provide Defendant Drake with any documented training on vehicle pursuit procedures, de-escalation, or the constitutional limits on the use of deadly force during vehicle encounters at any point during his approximately four years of service with the Huntington Police Department prior to the subject incident.

*Id.* Predominant amongst these allegations is liability based upon omission—failing to train, supervise, and maintain and update policy.

To succeed on omission claims, "a plaintiff must show that the omission 'manifests deliberate indifference' on the part of the municipality 'to the rights of citizens.'" *Mullen v. Town of Sunset Beach, N. Carolina*, 175 F.4th 466, 472 (4th Cir. 2026) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). "Deliberate indifference is a demanding standard. It requires proof that municipal policymakers (1) knew or should have known that their failure to act was likely to result in constitutional injury, and (2) disregarded that risk." *Id.* (citations omitted). Additionally, a plaintiff typically cannot rely upon an isolated occurrence to establish municipal liability and, instead, "must demonstrate a pattern of 'persistent and widespread' similar constitutional violations sufficient to place policymakers on notice that their failure to adopt appropriate policies or training would likely result in constitutional injury." *Id.* (quoting *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402-03 (4th Cir. 2014) (other citation omitted)). Under this theory, "[s]poradic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Owens*, 767 F.3d at 403 (citation omitted).

Defendants argue Count IV cannot survive because Plaintiff has not alleged any facts demonstrating any pattern of violations. However, Plaintiff insists her claims fall under the single-incident exception the Supreme Court recognized in *Canton* when it held the need to demonstrate a pattern may not be necessary when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers in the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. To explain, the Supreme Court stated in footnote 10:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id*. at n.10, in part (citation omitted). Plaintiff argues her allegations fall squarely within this example as Officers Drake and Lawhon were armed and authorized to conduct vehicle pursuits, yet Plaintiff claims they were inadequately trained on the constitutional requirements and limits in conducting those pursuits and the use of deadly force, resulting in Mr. Arthurs' death. Plaintiff asserts the need for such training is so obvious that it supports an inference of deliberate indifference for purposes of municipal liability.

Defendants disagree, noting *Canton's* single-incident exception only applies in "rare" and "narrow" circumstances[2] and does not include instances in which "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury[.]" *Id.* at 391. Defendants argue Plaintiff has pled away her theory of deliberate indifference because she states in the Complaint that Officer "Drake graduated from the West Virginia State Police Academy on March 19, 2021, and had been a law enforcement officer for approximately four years at the time of the subject incident." *Compl.* ¶70. Additionally, Plaintiff alleges that Officer Lawhon "had received specialized training in de-escalation, high-risk vehicle stops, and vehicle gunfighting techniques." *Id.* ¶¶31, 53. Moreover, Plaintiff states in her Complaint that the Huntington Police Department has a Vehicle Pursuit Policy. Defendants assert

---

[2]*Connick*, 563 U.S. at 63, 64 (acknowledging that *Canton* said in some cases "a pattern of similar violations might not be necessary to show deliberate indifference," but emphasizing such possibility is "rare" and only applies "in a narrow range of circumstances").

Plaintiff's real grievance is that the City did not provide officers with the granular-level training she preferred. Thus, Defendants argue Plaintiff cannot show the *Canton* exception applies based on allegations that the City should have trained its officers better on a particular subtopic.

Although Defendants correctly point out that Plaintiff indicates in paragraph 70 of the Complaint that Officer Drake graduated from the West Virginia State Police Academy, they omit the very next line which states "[h]is documented training history contains no pursuit-specific training, no de-escalation training, and no training on the constitutional limits of deadly force during vehicle encounters." *Compl.* ¶70. Additionally, despite Plaintiff alleging Officer Lawhon received training in de-escalation strategies, high-risk vehicle stop techniques, and vehicle gunfighting techniques, Plaintiff insists that none of that training involves the constitutional limits of deadly force. Plaintiff argues it is premature for the City to challenge the adequacy of the training they provided Officers Drake and Lawhon, as resolution is better suited for summary judgment or a jury.

As this point, the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in her favor. Here, Plaintiff has alleged the officers received *no* training on the constitutional limits of deadly force during vehicle encounters. In describing what would constitute a single-incident exception in *Canton*, it is inconceivable that the Supreme Court premised its hypothetical on a situation in which the officers were provided with no law enforcement training whatsoever and were simply handed firearms and told to go fight crime. It is expected, indeed required, that all police officers receive some training. However, even with training, the Supreme Court found that "the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U.S. at 390 n.10.

When it comes to the constitutional limitations of using deadly force in vehicle encounters, such training is not granular, as suggested by Defendants. Rather, vehicle encounters are an everyday, common occurrence in law enforcement, and officers often have to make split second decisions when they perceive danger or when an individual attempts to flee in a vehicle. Thus, training necessary to prevent officers from unjustifiably taking away the fundamental right of one to take a next breath can be said to be so obvious that failing to do so could properly be characterized as "deliberate indifference" to constitutional rights. Consequently, at this point in the proceedings, the Court **DENIES** Defendants motion to dismiss Count IV.[3]

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** Defendants' motion to **DISMISS** the official-capacity claims against Officers Drake and Lawhon, Count V for gross and reckless misconduct against the City of Huntington, the claim for punitive damages against the City of Huntington, and Count III for unlawful seizure against Officer Drake. The Court **DENIES** Defendants' motion to dismiss the *Monell* claim in Count IV against the City of Huntington.[4]

[3]In a footnote, Defendants argue that, even if the failure-to-train theory advances, the Court should dismiss Plaintiff's allegations in Count IV in paragraph 67(e) (failure to supervise), (f) (tolerance or ratification and a pattern of failing to discipline officers who use excessive force), and 67(h) (failure to update the Vehicle Pursuit Policy). At this point, the Court finds Plaintiff's allegations are sufficient to proceed on Count IV and whether all the allegations made in support of that theory survive is a matter best resolved on summary judgment. In addition, Defendants argue that paragraph 46 in Count I should be dismissed because it asserts neither officer was disciplined for the incident. Although the Court agrees it does not support Count I's excessive force claim against Officer Drake, Defendants did not move to dismiss Count I, and the Court views it merely as a gratuitous allegation that does not change the fact Count I remains.

[4]At the conclusion of her Response brief, Plaintiff requests this Court grant her leave to amend her Complaint to the extent the Court finds it deficient. However, a statement in a Response brief is not the proper mechanism to make such a motion. If Plaintiff wants to amend her Complaint, she must file an appropriate motion and memorandum in accordance with the Federal Rules of Civil Procedure.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: September 3, 2026

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE